UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ASUA BUIE,

                        Plaintiff,

        v.                                    Case No. 14-cv-1375-pp

FLOYD MITCHELL, IONE GUILLONTA,
BRUCE BUEGE, HEATHER PAULSEN,
CHARLES FACKTOR, CINDY O'DONNELL,
ANA BOATWRIGHT, CHRIS LOBERG,
KELLY QUARLES, and KELLI R. WILLARD WEST,

                        Defendants.

**ORDER GRANTING THE DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT (DKT. NO. 102), DENYING THE PLAINTIFF'S MOTION FOR
SANCTIONS (DKT. NO. 143), GRANTING THE PLAINTIFF'S REQUEST TO
SET ASIDE DKT. NO. 138 MOTION FOR SANCTIONS (DKT. NO. 143) AND
DEEMING THE PLAINTIFF'S FIRST MOTION FOR SANCTIONS
WITHDRAWN (DKT. NO. 138), AND DISMISSING CASE**

        Plaintiff Asua Buie is a former prisoner, who is representing himself. On

October 2, 2015, the court screened the amended complaint and allowed the

plaintiff to proceed on a First Amendment, free-exercise-of-religion claim, based

on allegations that prison officials at the Milwaukee Secure Detention Facility

denied him a kosher diet. Dkt. No. 27 at 8. On May 24, 2016, the court granted

in part and denied in part the plaintiff's motion to amend the complaint. Dkt.

No. 46. The court granted the motion to the extent that it allowed the plaintiff

to add punitive damages to his request for relief. Id. at 5. The defendants have

filed a motion for summary judgment, which is fully briefed and ready for

1

resolution.[1] Dkt. No. 102. The plaintiff has filed a motion for sanctions, dkt. no. 138, and a renewed motion for sanctions that includes a request to withdraw the prior motion for sanctions, dkt. no. 143. The court resolves these motions in this order and dismisses this case.

## I.  DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Dkt. No. 102)

### A.  Relevant Facts[2]

On more than one occasion, the plaintiff was an inmate at the Milwaukee Secure Detention Facility (MSDF)—the facts in the plaintiff's complaint occurred when he was an inmate from May 12, 2014 to December 12, 2014.

---

[1] The defendants filed their summary judgment motion on March 17, 2017. Dkt. No. 102. The court granted the plaintiff's three motions for extensions of time to respond. See April 21, 2017, Text-Only Order; May 4, 2017, Text-Only Order; Dkt. No. 124. The plaintiff filed his summary judgment response on November 22, 2017, along with a request for the court to accept his untimely response. Dkt. Nos. 128, 130. The court granted that request based, in part, on the plaintiff's unstable housing situation after his release from prison, which he said had prevented him from filing a timely response. Dkt. No. 140 at 3-4. The defendants filed their summary judgment reply on April 16, 2018. Dkt. No. 146.

[2] This section is taken from the Defendants' Reply to Plaintiff's Response to Defendants' Proposed Findings of Fact, dkt. no. 148, and from the Defendants' Response to Plaintiff's Additional Statement of Facts, dkt. no. 147.
The court includes only properly supported facts, and disputes of facts, in this section. See Fed. R. Civ. P. 56(c). The court does *not* include in this section facts, and disputes of facts, that are not properly supported by materials in the record. Likewise, the court does not include in this section "disputes" of facts that do not respond to the proposed fact.
The defendants object to some of the facts in the plaintiff's Additional Statement of Facts, dkt. no. 133, because the facts do not appear to cite to evidence in the record or because it is not clear to what, if any, evidence in the record a proposed fact relates. After the defendants filed their summary judgment reply, the plaintiff filed a request for the court to take "judicial notice" of materials in the record that he cited in the Additional Statement of Facts. Dkt. No. 149. And, the plaintiff's Reply to Defendants' Response to Plaintiff's Additional Statement of Facts provides more information as to the location in the record of some of these facts. Dkt. No. 151. The court has reviewed these materials and—where relevant, properly supported and not duplicative of the defendants' proposed facts—has included facts from the Plaintiff's Additional Statement of Facts in this section.

Dkt. No. 148 ¶1. Defendant Floyd Mitchell was the warden at MSDF during the time of the events in the complaint. Id. ¶2. Defendant Ione Guillonta is the deputy warden at MSDF. Id. ¶3. Defendant Bruce Buege is the food service administrator there. Id. ¶4. Defendants Ana Boatwright and Charles Facktor were corrections complaint examiners "at times relevant to" the plaintiff's complaint. Id. ¶¶5-6. Defendant Chris Loberg is the food service manager at MSDF. Id. ¶7. Defendant Cindy O'Donnell is a policy initiatives advisor at the Wisconsin Department of Corrections (DOC) Central Office in Madison, Wisconsin. Id. ¶8. Defendant Heather Paulsen is an institution complaint examiner at MSDF. Id. ¶9. Defendant Kelly Quarles was a unit manager at MSDF at times relevant to this complaint; she's now retired. Id. ¶10. Defendant Kelli Willard West works at the DOC's Division of Adult Institutions as an administrative policy advisor; her working title is religious practices coordinator. Id. ¶11.

  1. *The Laws of Kashrut*

Many people of the Jewish faith follow the dietary laws[3] of kashrut, also referred to as "keeping kosher." Id. ¶12. Some of the laws of kashrut include: no consumption of pork or shellfish, the use of certain slaughtering processes and certain food preparation processes, and no serving dairy with meat. Id.

Jews follow the laws of kashrut to varying degrees, depending on their level of religious observance. Id. ¶13. Orthodox Jews may only eat food prepared in special kosher kitchens, and keep separate dishes and utensils—

---

[3] The plaintiff objects that keeping kosher is more than just following dietary laws; "for the practicing Jew[, it] is a call to Holiness." Dkt. No. 132 at ¶12.

one set for dairy, one set for meat. <u>Id.</u> Conservative and Reform Jews are generally less strict about the laws. <u>Id.</u> They may avoid pork products, but may not mind mixing dairy and meat products. <u>Id.</u> They may not keep kosher at all. <u>Id.</u>

## 2. *The DOC's Kosher Diet*

The Department of Corrections allows inmates to declare a religious preference during incarceration. <u>Id.</u> at ¶14. Inmates who identify as Jewish have the option to request a kosher diet. <u>Id.</u> ¶16. Because DOC facilities do not have kosher kitchens, the DOC follows the Academy of Nutrition and Dietetics (AND) guidelines for serving kosher meals in non-kosher food service operations. <u>Id.</u> ¶¶17, 20. The AND guidelines represent commercial food-service industry standards developed in consultation with Rabbinical leaders. <u>Id.</u> ¶21. These procedures include, but are not limited to: prohibiting any "treif"[4] foods (e.g., pork, shellfish); serving dairy products only with meatless meals; preparing kosher meals separate from all other meals; using disposable cookware and serving containers; and serving pre-packaged entrees, unopened. <u>Id.</u> To follow AND guidelines, the DOC serves milk with the meatless morning and evening meals. <u>Id.</u> ¶22. The midday meals often contain meat, so it never serves dairy products with that meal. <u>Id.</u>

The MSDF kitchen follows the AND guidelines because management at the DOC's Central Office directs them to. <u>Id.</u> ¶23. The kosher diet provided under DAI Policy 309.61.03 is based on the AND guidelines. <u>Id.</u> Kitchen staff at

---

[4] "Treif" (also spelled "trayf," "treyf" or "traif," is the Yiddish word for "unkosher." https://www.chabad.org.

MSDF receive detailed instructions regarding kosher preparation with respect to every type of food they prepare, so that they can abide by the AND guidelines. Id. ¶24.  For instance, there are specific instructions provided to kitchen staff for kosher preparation and serving of green beans. Id. The beans are cooked on a lined pan, covered with foil or saran wrap, and served in a disposable "styro tray," or in disposable bowl with disposable lid. Id.

Kosher religious diet meals most commonly consist of nonfat dry milk to be mixed with water, fresh and/or canned fruits and vegetables, fruit and vegetable juices, mashed potatoes, prepackaged certified kosher meals containing meat, hard cooked eggs, lettuce salads, fruit cocktail and graham crackers. Id. ¶27.

Generally, MSDF food service staff members train new food service staff on how to prepare all regular and special diets. Id. ¶30. This includes training them on how to follow the recipes and guidelines created for kosher food preparation and service in order to comply with the AND guidelines and with the kosher diet section in DAI Policy 309.61.03 "Religious Diets." Id. As the Manual of Clinical Dieticians advises, MSDF Food Service takes precautions to make sure that disposable cookware (foil pans, tin foil, or plastic wrap) is used to prevent contamination of kosher foods by non-kosher cooking utensils or equipment. Id. ¶31. Disposable meal trays and utensils are used for serving kosher meals, and single-serve certified kosher meals are served to the inmates unopened to avoid contamination. Id.

3.  *The Plaintiff's Correspondence and Inmate Complaints*
    *Regarding his Kosher Diet*

The plaintiff was approved for a kosher religious diet based on his designated religious preference of Judaism, and had received the kosher diet since his arrival at MSDF in May 2014. Id. ¶47.

a.  Correspondence to Defendant Buege

On August 4, 2014, the plaintiff submitted an Interview/Information Request to defendant Buege which stated that the meals he was receiving were not kosher. Dkt. No. 1-1 at 2. Specifically, he stated that the "breakfast cereal, the eggs in the plastic bag, the bread wrapped in ceran [sic] wrap, the veggies at lunch and dinner, served in the Styrofoam cup with ceran [sic] wrap, wrapped around the cup" were not kosher, because they were "opened or prepared in a non-kosher kitchen." Id. The plaintiff also stated that all kosher foods "must be sealed, even the eggs and no other item(s) should be cooked in a non-kosher kitchen. Once these item(s) are opened, the kosher status becomes void. All items I receive for meals should be factory sealed that comes from a kosher kitchen. It's o.k. to heat these item(s) up but don't open them. Thank you." Id.

b.  Inmate Complaint MSDF-2014-18915

On September 26, 2014, defendant Paulsen, an institution complaint examiner, acknowledged the plaintiff's first inmate complaint about his kosher meals. Dkt. No. 148 at ¶48. In complaint MSDF-2014-18915, the plaintiff alleged that the meals he was receiving weren't kosher, and did not "fit with the guidelines of kosher food." Dkt. No. 106-1 at 9. He noted the following issues:

the meals were opened, not sealed; they were served in non-kosher kitchens; the entire meal was not under a secured seal; parts of the meal (such as veggies) were prepared at MSDF and placed in a Styrofoam cup covered with Saran wrap; the boiled eggs were served in a zip-lock plastic bag; and the bread was wrapped in Saran wrap. Id. As part of her investigation into the complaint, defendant Paulsen forwarded the plaintiff's complaint to defendant Willard West, the religious practices coordinator, because the complaint appeared to relate to religious accommodations and practices in the institution, and she believed Willard West would have the most knowledge regarding that topic. Dkt. No. 148 at ¶49. Willard West reached out to Dietetic Services Director Christine Berndt-Miles (not a defendant) and forwarded the plaintiff's complaint to her. Id. at ¶50. Willard West understood the plaintiff to be arguing that his entire meal needed to be prepared outside of the institution's non-kosher kitchen in order for the meal to be kosher; if her understanding was correct, the complaint would not have been valid, because MSDF was preparing the meals based on the AND guidelines. Id. at ¶51.

On September 29, 2014, Berndt-Miles contacted defendants Loberg and Buege (MSDF Food Service management) to talk about potential issues in how their kitchen was preparing and serving kosher meals. Id. ¶55. She asked them to confirm that they were purchasing kosher canned goods when serving a hot vegetable or three-bean salad; that they were "dishing" items with disposable utensils into a disposable container and double-wrapping with film; and that the food was not being opened or unsealed until it was given to the inmate. Id.

¶56. Buege confirmed this was all happening. <u>Id.</u> Based on this information, Willard West concluded that the plaintiff's complaint was not valid because the meals were being prepared based on AND guidelines. <u>Id.</u> ¶58. Willard West drafted and sent suggested language to Paulsen to assist in her response to the plaintiff's complaint. <u>Id.</u> ¶59; Dkt. No. 147 ¶3.

On October 2, 2014, Paulsen recommended that the plaintiff's complaint be dismissed, using Willard West's suggested language, and explaining that DOC facilities do not have kosher kitchens, but the meals were being prepared using AND guidelines. Dkt. No. 148 at ¶60. She wrote, "Food service personnel have verified that MSDF follows menus, recipes and procedures documented in the Computrition database used by DOC for dietary menu management." <u>Id.</u> Defendant Mitchell, the reviewing authority for inmate complaints, dismissed complaint MSDF-2014-18915 on October 6, 2014. <u>Id.</u> ¶62; Dkt. No. 147 ¶10.

The plaintiff appealed the dismissal of MSDF-2014-18915 to the corrections complaint examiner, defendant Facktor, who recommended dismissal. Dkt. No. 148 ¶63. On October 15, 2014, defendant O'Donnell, the DOC Secretary's designee, reviewed the record for MSDF-2014-18915, and accepted Facktor's recommendation to dismiss the appeal. <u>Id.</u> ¶67.

### c. Inmate Complaints MSDF-2014-20734, MSDF-2014-22723, MSDF-2014-22711 and MSDF-2014-23083

On October 21, 2014, Paulsen acknowledged receipt of offender complaint MSDF-2014-20734. <u>Id.</u> ¶68. Again, the plaintiff complained about his kosher meals, and provided more examples of why his food allegedly did not comply with kosher requirements: his hard-boiled eggs were peeled, and the

food was being served wrapped in plastic wrap and in Styrofoam cups. Id.; Dkt. No. 147 ¶18.

Because this was the second inmate complaint the plaintiff had submitted about issues with his kosher meals, Paulsen investigated further to make sure she was giving an accurate response to the plaintiff and an accurate recommendation to the appropriate reviewing authority. Dkt. No. 148 ¶70. During Paulsen's investigation, various personnel were contacted about the plaintiff's complaints, including Buege, Loberg, Willard West, defendant Quarles (the unit manager), defendant Guillonta (the deputy warden), Assistant Legal Counsel Katy Ariss, Rabbi Mitchell Cohen and MSDF Chaplain Ronald Beyah. Id. ¶71.

After "much discussion and inquiry into the MSDF kitchen's practices and procedures, an error was found regarding the peeling of the hard-boiled eggs." Id. ¶72. After Buege learned about this allegation from Paulsen, he was able to determine that one of the limited-term employee workers had been peeling the eggs. Id. The employee told Buege that she thought she was being nice by peeling the hard-boiled eggs; she did not understand that it made the eggs not kosher by serving them that way. Id. Buege agreed to further train staff on this topic, and Rabbi Cohen said that he would be willing to come to the institution again and provide guidance to kitchen staff to ensure the integrity of the religious kosher meals. Id. ¶73. Buege concluded that the limited-term employee made a mistake; he believed that the issue was fixed, because he showed the employee the religious policy and reference materials

available to food service workers, which stated that egg shells need to stay intact for the kosher diet. Id. ¶74.[5]

Neither Buege nor Loberg personally instructed any staff member to peel the hard-boiled eggs served to inmates on a kosher diet. Id. ¶75. There are guidelines in the kitchen specifically for food service workers to reference when preparing and serving items for special diets. Id. ¶76. If Loberg had been made aware at the time the incident had occurred that a food service worker was violating the policy regarding peeling the hard-boiled eggs for kosher diets, she would have addressed the issue with her staff at that time.[6] Id. ¶77.

On November 6, 2014, Willard West wrote to Rabbi Charles Cohen, a community advisor who volunteered at many of the institutions. Id. ¶78. She explained there had been some errors in administering the kosher diet at MSDF which were being addressed with the staff there. Id. She asked Rabbi Cohen to let her know if he heard of any other glitches, stating, "[W]e'll continue to investigate and resolve." Id.[7] MSDF also arranged to have Rabbi Cohen visit and observe the food preparation. Id. ¶79. It was Willard West's understanding that Rabbi Cohen visited the MSDF kitchen on December 12,

---

[5] The plaintiff objects to this proposed fact, stating that Buege provided conflicting information about the identity of the employee who peeled the eggs. Id. This lack of identifying information does not undermine Buege's testimony.

[6] The plaintiff objects, arguing that Loberg was aware of the violations in October 2014. He says that she received certified mail, and had time over the course of all of his complaints to address the issue. Id. (plaintiff's response).

[7] The defendants' proposed fact accidently cited to Willard West's declaration at ¶28, and should instead cite to ¶29. Id.

2014, and that he concurred that MSDF was in compliance with the process for serving kosher food from a non-kosher kitchen. Id. ¶80.[8] On December 17, 2014, Chaplain Beyah informed Paulsen that MSDF was preparing the kosher meals correctly, and that the plaintiff's complaint was false. Id. ¶81.

On January 7, 2015, after a thorough investigation into the plaintiff's complaint, Paulsen recommended dismissal of MSDF-2014-20734. Id. ¶82; Dkt. No. 147 ¶7. She explained that the DOC does not have kosher kitchens, and it therefore follows AND guidelines. Dkt. No. 148 ¶82. She noted that Rabbi Cohen had observed preparation and found that MSDF was in compliance with AND guidelines. Id. The only error discovered had been in peeling the hard-boiled eggs. Id. Apparently, the new staff working in the kitchen thought she was being nice by peeling the eggs, and did not understand the kosher aspect. Id. Defendant Mitchell dismissed MSDF-2014-20734 on January 12, 2015. Id. Defendant Mitchell was only made aware of the error regarding the peeling of the hard-boiled eggs when he received the plaintiff's offender complaint. Id. ¶83. At that time, he was assured that training would occur and the matter was corrected. Id.

In defendant Paulsen's recommendation for MSDF-2014-20734, she noted that her response was addressing three other complaints about kosher meals that the plaintiff had filed after he submitted the current complaint. Id.

---

[8] Although Willard West was told that Rabbi Cohen visited with the plaintiff after visiting the kitchen on December 12, 2014, the plaintiff states that he didn't meet with the Rabbi that day because that is the day he transferred to the Dodge Correctional Institution. Id. The plaintiff did, however, meet with the Rabbi on October 29, 2014. Id.

at ¶84. Her recommendation responded to all four complaints: MSDF-2014-20734, MSDF-2014-22723, MSDF-2014-22711 and MSDF-2014-23083. Id.

Complaint MSDF-2014-22723 was received on October 14, 2014. Id. ¶85. In it, the plaintiff complained that on October 3, 2014, his dinner meal included boiled eggs that were peeled, discolored and had a tangy smell to them. Id. Complaint MSDF-2014-22711 also was received on October 14, 2014. Id. ¶86. In it, the plaintiff complained that on October 3, 2014, his dinner meal included some boiled eggs that were peeled. Id. Complaint MSDF-2014-23083 was received on November 21, 2014. Id. ¶87. In it, the plaintiff complained that on November 19, 2014, he was served eggs that were peeled. Id. Mitchell believed that Paulsen's recommendation on MSDF-2014-20734 was thorough and correct, and the issues in the plaintiff's other offender complaints had been addressed and corrected through complaint MSDF-2017-20734. Id. ¶88.

On January 2, 2015, the correction complaint examiner's office received the plaintiff's appeal of the dismissal of MSDF-2014-20734. Id. ¶89. The office had not yet received a decision from the institution, but since it had been thirty days, the plaintiff was allowed to appeal the dismissal under Wis. Admin. Code §DOC 310.12(3). Id.; Dkt. No. 147 ¶18. The corrections complaint examiner, defendant Boatwright, considered the plaintiff's appeal. Dkt. No. 148 ¶90. By the time Boatwright made her recommendation on January 28, 2015, the institution had issued its decision on the inmate complaint. Id. ¶91. Boatwright found that the institution complaint examiner's decision was appropriate and recommended the appeal be dismissed. Id.

Defendant O'Donnell reviewed Boatwright's recommendation. Id. ¶92. Based on her review of the complaint record and appeal, she believed Boatwright's recommendation to be accurate, and accepted the dismissal as the decision of the Office of the Secretary. Id. O'Donnell noted the error about peeling the hard-boiled eggs, which appeared to her to be an isolated incident made by a single employee, and it also appeared that the issue had been corrected. Id. ¶93. Because the complaint and appeal alleged that MSDF was not preparing kosher meals correctly, and there was no evidence beyond this single issue that they were not, O'Donnell did not believe that affirming the complaint was warranted. Id. O'Donnell had no reason to believe that the institution was purposely preparing and/or serving kosher food incorrectly to the inmates on the kosher religious diet, and did not see any reason to further investigate the issue. Id. ¶94.

### 4. *Global Food Industries Casseroles*

In September 2014, a meeting took place with MSDF Food Service staff, Chaplain Beyah and Rabbi Cohen. Id. ¶96. Loberg's staff showed the Chaplain and the Rabbi the Global Food Industries, Inc. (GFI) meals that MSDF had in-house and that were included on the general institution menu. Id. The meals were labeled 100% soy. Id. Chaplain Beyah and Rabbi Cohen informed Loberg and Buege that the GFI casseroles that were being served throughout the

institution for the general menu were Halal[9] and Kosher certified, and that MSDF could serve them to the inmates on the special religious diets. Id. ¶97.

On September 29, 2014, Buege sent out a memo to all inmates on kosher and halal religious diets, telling them that they would be receiving the GFI casseroles when they were on the general institution menu; he included the halal and kashrut certifications. Id. ¶98. MSDF Food Service staff were educated on how to properly scoop and serve the GFI casseroles so that they remained kosher upon service. Id. ¶99.

MSDF Food Service staff had been serving the GFI casseroles for the general institution menu for approximately ten years before they were informed that they were halal and kashrut certified. Id. ¶100. Previously, the kitchen staff had served My Own Meals, Inc. brand casseroles to inmates receiving the kosher religious diet. Id. My Own Meals provides shelf-stable, ready-to-eat meal options to individuals requiring kosher and halal certification. Id. ¶101. Once MSDF Food Service staff were informed that the GFI casseroles were kosher certified, they made the change partly to help with food costs, since a My Own Meals tray costs about $3.50 a piece, whereas a GFI entree costs about $0.35 cents a serving. Id. ¶102.

On October 17, 2014, Willard West received an email from the plaintiff's fiancé, Ms. Chachere-Mindingall, saying that the facility was not in compliance with the DAI policy because the plaintiff was receiving food that was not being prepared or handled with disposable cookware and serving utensils. Id. ¶103.

_____

[9] "Halal" means lawful, or permissible, under Shari'ah law. https://www.hlalafoodauthority.com.

Willard West forwarded the email to Berndt-Miles and Paulsen, to keep them in the loop. Id.

On November 4, 2014, Chachere-Mindingall emailed Guillonta and Mitchell, complaining that the plaintiff had been served what the rest of the inmates were having, and that the food did not fall within DOC policy guidelines. Id. ¶104; Dkt. No. 147 ¶19. The email was forwarded to Willard West and Berndt-Miles the same day. Dkt. No. 148 ¶105.

On November 6, 2014, Buege had a phone conversation with Berndt-Miles concerning the casseroles. Id. ¶106. The kitchen recently had served a GFI entrée to the plaintiff, since they had learned that the GFI casseroles were certified kosher, but there was concern that because the kitchen was preparing the GFI casserole meals to be served in high quantity, they might be breaching the kosher certification. Id. The plaintiff had been served the GFI casserole one time. Id. ¶107.

Based on the November 6, 2014 phone conversation with Berndt-Miles, Buege determined that MSDF would go back to using My Own Meals casseroles to serve to kosher inmates on the days that the GFI casseroles were on the institution's general menu. Id. ¶108. Berndt-Miles informed Willard West of Buege's decision regarding the GFI casseroles. Id. ¶109. Food service staff had not been intentionally preparing and serving the GFI casseroles incorrectly to inmates on the kosher diet. Id. ¶110. Once Buege received notification that they were potentially voiding the certification based on how the meals were

prepared and served for mass quantity, he immediately worked to resolve the issue and went back to using My Own Meals for kosher diets. Id.

     5.    *Defendants' Involvement in the Events at Issue*

        a.    Defendant Paulsen

Defendant Paulsen does not have any direct involvement with MSDF's kitchen or preparing food for the inmates, or the authority to change Department of Adult Institutions policies. Id. ¶111. But she notified all staff members whom she believed did have involvement with the plaintiff's issues, so that the issues could be fixed in the event his complaints were found to be substantiated. Id.

        b.    Defendants Mitchell, Guillonta, and Quarles

No other institution staff besides food service staff are involved in food preparation. Id. ¶112. Defendants Mitchell, Guillonta and Quarles were not involved in daily oversight of the kitchen, or supervision of food preparation and service. Id. None of them were involved in the errors related to serving the GFI casserole or peeling the hard-boiled egg shells. Id. None of them were involved in creating the general institution menu or any of the menus for the religious diets. Id.

Defendant Mitchell did not learn about the plaintiff's complaints regarding kosher meal violations until, as the appropriate reviewing authority, he reviewed MSDC-2014-18915. Id. ¶113.

Defendant Quarles learned that the plaintiff was unhappy with his meals after the plaintiff complained to him about the meals not being kosher, but

Quarles was never aware of specific kosher violations. Id. ¶114. After speaking with the plaintiff, Quarles was informed by Chaplain Beyah that the kitchen was providing the plaintiff with the best they could, given that they did not have a kosher kitchen. Id. ¶115. Quarles never was informed that there were new kitchen staff who did not understand peeling the eggs voided the kosher aspect. Id. ¶116.

On November 28, 2014, Guillonta received an email from Chachere-Mindingall about how MSDF was allegedly starving the plaintiff by not allowing him to eat and denying him canteen. Id. ¶117. Guillonta recalls having one or two phone conversations with Chachere-Mindingall. Id. ¶118. Guillonta listened to Chachere-Mindingall's concerns regarding the plaintiff's kosher meals, and followed up with Buege. Id. On December 12, 2014, Guillonta held a meeting with Chaplain Beyah, Buege and Rabbi Cohen to discuss the potential issues. Id. ¶119. These individuals also were made aware of the plaintiff's complaints, and were the people who would be able to help fix any errors that may have been occurring in the MSDF kitchen while preparing and serving kosher food. Id. Guillonta relies on Food Service management to handle issues that may arise, and to notify the warden or deputy warden of larger issues that may require their attention. Id. ¶120. Once informed of the complaints, Guillonta took necessary steps to make sure the correct people were notified who could fix the issues, if there were any. Id. ¶121. Once the Rabbi visited the kitchen and informed kitchen staff that they were following the process correctly, Guillonta did not believe there were any other issues that

needed to be addressed, and he believed that the plaintiff's complaints had been resolved. Id.

c.    Defendants Buege and Loberg

In his capacity as the food service administrator, Buege does not prepare or serve food, nor does he directly supervise the preparation and service of the meals. Id. ¶122. The DOC's Food Service leaders, who Buege supervises, supervise the food service workers preparing and serving the meals at MSDF. Id.

As food service manager, Loberg usually does not prepare and serve food herself, but she sometimes fills in if needed. Id. ¶123. She was not responsible for peeling the hard-boiled eggs. Id. Prior to being named in this lawsuit, she does not recall ever being specifically informed there were violations in the kitchen with workers peeling hard-boiled eggs served to inmates who were on the kosher diet. Id.

At the time MSDF decided to serve the GFI casserole to kosher inmates, Loberg and Buege believed it was certified kosher, and could be served to kosher inmates in such a way as to remain kosher upon service. Id. ¶124.

B.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317,

324 (1986); <u>Ames v. Home Depot U.S.A., Inc.</u>, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." <u>See</u> <u>Anderson</u>, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Id.</u>

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

C.    <u>Discussion</u>

1.    *The Parties' Arguments*

The defendants contend that if what the plaintiff wanted was a stricter religious diet, he failed to exhaust his administrative remedies, because he didn't submit a DOC-2075 "Request for New Religious Practice" form. Dkt. No. 103 at 9-10. The defendants also argue that they lacked sufficient personal involvement in the plaintiff's First Amendment claim, based on allegations that

MSDF staff inadvertently peeled the plaintiff's eggs and that an otherwise kosher casserole had been prepared in a way that voided its kosher status. Id. at 14. Specifically, the defendants assert that the defendants involved in investigating and ruling on the plaintiff's inmate complaints—Paulsen, Facktor, Willard West, Boatwright and O'Donnell—lacked sufficient personal involvement. Id. at 15. And they argue that the remaining defendants— Mitchell, Guillonta, Quarles, Buege and Loberg—are not personally responsible for the errors and did not cause the errors. Id. at 18-20. The defendants also contend that the plaintiff cannot show that these errors substantially burdened his practice of his faith. Id. at 22. Next they argue that they are entitled to qualified immunity, because providing meals prepared in a non-kosher kitchen did not violate a clearly established right and because mistakenly burdening the plaintiff's practice of Judaism did not violate a clearly established right. Id. at 23-25. Finally, the defendants contend that they are entitled to summary judgment on the plaintiff's claim for compensatory damages because he cannot recover them under 42 U.S.C. §1997e(e), and on his claim for punitive damages because he has not produced sufficient evidence to support any request for punitive damages. Id. at 27.

The plaintiff responded that he never asked for a new accommodation, only that the defendants adhere to the DOC policy. Dkt. No. 129 at 4. In other words, the plaintiff doesn't challenge the DOC's policy regarding kosher meals, but contends that the defendants didn't follow the policy. Given this, the court will not consider the defendants' argument that the plaintiff failed to exhaust

administrative remedies as to his claim that he wanted a stricter religious diet than existing MSDF policy provided.

The plaintiff insists that all of the defendants were personally involved in the deprivation of his rights. Id. at 4-18. He states that in the memo dated September 29, 2014, Buege arbitrarily altered the religious meal menu, and authorized the preparation and service of kosher certified meals without ascertaining whether preparation and service of those meals fit the guidelines of a kosher meal. Id. at 5. The plaintiff also alleges that Buege and Loberg overlooked the issue after being notified of the problem, causing further constitutional deprivation to the plaintiff. Id. at 5-6. According to the plaintiff, Buege and Loberg caused the unconstitutional acts, because they implemented a practice unsupported by §DOC 309.61.03 that prevented the observance of religious practice, and they implemented a custom that kosher meals would be provided from an unapproved menu (General Population) which was inconsistent with established policy for the religious (kosher) meal provision. Id. at 21. They also allegedly continued to restrict the plaintiff from religious observance and practice after they knew their actions offended religious policy. Id. at 22.

Regarding Paulsen, the plaintiff states that she failed to investigate inmate complaint MSDF-2014-18915, instead contacting Willard West about the issue raised in the complaint, and then inappropriately using Willard West's recommendation in her report recommending dismissal of the plaintiff's inmate complaint. Id. at 6-9, 23. Next, the plaintiff asserts that Mitchell

conducted a flawed review of Paulsen's recommendation to dismiss inmate compliant MSDF-2014-18915, that he reviewed other inmate complaints the plaintiff filed, and that despite his knowledge of the religious policy violation, failed to act to correct it. Id. at 9-12. The plaintiff also states that Willard West was aware of the problems from the beginning—from Paulsen, from the plaintiff's fiancée (now wife), from Rabbi Cohen—but did nothing. Id. at 12-15. The plaintiff also says that Guillonta knew of the violations because she received emails and calls from the plaintiff's fiancée, and she did not correct them. Id. at 16. Next, the plaintiff states that Quarles did not respond to emails or calls from the plaintiff's fiancée and was in a realistic position to ensure that the food served was correct. Id. The plaintiff states that O'Donnell authorized the dismissal of inmate complaint MSDF-2014-18915 and that she took no action, yet had full knowledge of the long-standing issue and unresolved violations. Id. at 17. The plaintiff alleges that Facktor was presented with a valid appeal of MSDF-2014-18915 yet he relied on an established record, devoid of facts as to the actions of staff, and failed to take action that would establish the facts as to the actions of Buege and Loberg. Id. at 17-18.

The plaintiff states that for over a six-month period, each meal the he was served was not kosher. Id. at 19. He summarizes the defendants' involvement in a paragraph near the end of his response brief:

> The defendants Bruce Buege and Chris Loberg acted without regard to the rights of the plaintiff in a causeless action with a conscious knowledgeable understanding of the duty imposed, to exercise due care and diligence to prevent injury but failed even after repeated notification of the peril, all defendants in the named complaint exhibit a clear and accurate knowledge of the plaintiff's

concerns, communications and expressed violations, but continued to ignore a progressive pattern of offensive practice, with thoughtless disregard despite evident inmate complaints, with ill consideration to the consequences, and responded with flagrant bad faith. The defendants, Heather Paulsen, lack of investigation, plagiarism of documents, and failure to respond on behalf of the institution to ensure policy was being followed aided in the creation of the significant hardship, and denied the plaintiff the full scope of his due process rights. Defendant Floyd Mitchell's lack of oversight to ensure that the findings of Heather Paulsen was accurate and correct as stated aided in the creation of the significant hardship and prevented the plaintiff from obtaining an amicable solution. Defendant Willard-West, who spearheaded the entire investigation, but failed to correct known violations to the policy which would have provided the pathway for a religious meal would be served [sic]. Defendant Ione Guillonta, after multiple communications with then Shannon Chachere-Mindingall, admitted that there were errors, they would be corrected, and extra training would be provided. Her failure to provide the necessary oversight was atypical and aided in the significant hardship. Defendant Kelly Quarles, after receiving knowledge from Chaplain Beyah that the meals were not kosher, failed to intervene on behalf of the plaintiff with that knowledge. However, stipulated to the contrary that the meals being served to the plaintiff were kosher because they said they were. Defendant Charles Facktor had no knowledge that MSDF was following the correct policies and procedures regarding the preparation and service of religious meals. Relying on a plagiarized complaint recorded of co-defendant Heather Paulsen, upheld the decision even though the plaintiff appealed her initial findings. In doing so, failed to provide an amicable resolution to the plaintiff and aided in the significant hardship. Defendant Ana Boatwright, armed with a history of complaints by the plaintiff, failed to support procedural compliance when defendant Heather Paulsen failed to answer the complaint in a timely manner without a request for an extension. Subsequently accepted the response on behalf of the institution as accurate and correct long after the plaintiff was removed from the institution. Defendant O'Donnell, on behalf of the office of the Secretary and in possession of information that supported the plaintiff's assertions, followed suit behind the aforementioned defendants and upheld their baseless decision.

Id. at 27-28.

## 2. *Applicable Law*

Prisoners have a limited right to exercise their religion under the First Amendment. See O'Lone v. Estate of Shabazz, 482 U.S. 342, 348-49 (1987); Turner v. Safley, 482 U.S. 78, 89-91 (1987); Tarpley v. Allen Cty., 312 F.3d 895, 898 (7th Cir. 2002). To establish a Free Exercise violation, the plaintiff must demonstrate that the defendants' actions "placed a substantial burden on [his] religious practices." Thompson v. Holm, 809 F.3d 376, 379 (7th Cir. 2016). "Prison officials may not intentionally and substantially interfere with an inmate's ability to practice his faith unless the restriction is reasonably related to a legitimate penological interest." Garner v. Muenchow, 715 Fed. App'x 533, 536 (7th Cir. 2017) (citing Turner, 482 U.S. at 89).

In the usual free exercise prisoner case, a prisoner contends that a prison policy or regulation hinders his ability to freely practice his religion. In those cases, the court would decide whether the policy or regulation in question reasonably relates to a legitimate penological interest. The plaintiff, however, does not challenge MSDF's kosher meal policy. Rather, he contends that the defendants violated the policy. To survive summary judgment on this claim, the plaintiff must proffer evidence from which a jury could reasonably find that the defendants "intentionally and substantially interfere[d] with [his] ability to practice his faith," and that the restriction was not "reasonably related to a legitimate penological interest." Id. A substantial interference, or burden, equates to "pressure on an adherent to modify his behavior and to violate his beliefs." Thompson, 809 F.3d at 379 (quotation omitted).

24

3.    *The Court's Analysis: The Plaintiff has not Established that the Defendants Intentionally Interfered with his Right to Practice his Religion*

The evidence shows that the plaintiff was mistakenly served hard-boiled eggs that been had peeled, which voided their kosher status. The first time the plaintiff complained about being served peeled hard-boiled eggs was on October 21, 2014, when he filed MSDF-2014-20734. Following an investigation, the error was discovered, Buege spoke with the employee who had been peeling the eggs, and he referred the employee to the policy which stated that for kosher meals, eggs must be served unpeeled.

The plaintiff also was served one GFI casserole; while Rabbi Cohen and Chaplain Beyah had determined that the casserole itself was certified kosher, it was served to the plaintiff in a manner that made it not kosher. Two days after Chachere-Mindingall emailed Guillonta and Mitchell and told them about the casserole, Buege decided that MSDF would stop serving the GFI casseroles to kosher inmates and go back to the previously-used My Own Meals casseroles.

Other than the peeled eggs and the GFI casserole, the plaintiff (and his fiancé) communicated with the defendants that the plaintiff was being served non-kosher food. For example, the plaintiff contacted Buege as early as August 2014, raising concerns that he was not being served kosher meals. He raised similar concerns in his September 26, 2014 complaint, MSDF-2014-18915. And on October 2, 2014, Chachere-Mindingall informed Willard West that the plaintiff was receiving meals that were prepared in a non-kosher kitchen. These concerns, however, did not notify the defendants that DAI kosher meal policy

25

had been violated, and thus would not have required MSDF to change what they were doing.

When the defendants *were* notified that DAI policy allegedly had been violated, the defendants investigated and resolved those issues. Regarding the peeled eggs, when Paulsen received inmate complaint MSDF-2014-20734 on October 21, 2014, which raised the issue of the peeled eggs (among several other issues that did not violate DAI policy), she began an extensive investigation that included contacting Buege, Guillonta, Willard West, Quarles and Loberg. She also contacted Rabbi Cohen, Chaplain Beyah and Assistant Legal Counsel Katy Ariss. Paulsen even organized a rabbinical visit to observe procedures in the kitchen. The investigation revealed that a kitchen staff member had been peeling eggs, not realizing that doing so voided their kosher status. Buege addressed the issue with staff and Rabbi Cohen agreed to come back and educate kitchen staff on kosher meals.

When, on October 17, 2014, Chechere-Mindingall informed Willard West that the plaintiff had received a kosher entrée that had not been handled with disposable serving utensils, an investigated ensued. Chechere-Mindingall contacted Guillonta and Mitchell on November 4, 2014. The investigation uncovered that staff improperly served the casserole, and by November 6, 2014, Buege had ordered staff to stop serving that casserole to kosher inmates.

The factual record does not support the plaintiff's contention that every meal he was served at MSDF was not kosher. Rather, the record shows that the plaintiff received one casserole which was not kosher because of the way it was

26

served, and that on several occasions he received peeled eggs, which voided their kosher status. When the plaintiff raised these issues, the defendants addressed them. The plaintiff has not shown how the other issues with his meals that he complained about made the meals non-kosher. Rather, he appears to be complaining about things that DAI policy permits under its kosher food policy, and the plaintiff does not challenge DAI kosher meal policy.

In order to survive summary judgment, the plaintiff must show that the defendants "intended to prevent [him] from practicing" his religion. Garner, 715 Fed. Appx. at 536. The evidence before the court demonstrates quite the opposite. The evidence demonstrates that there were policies in place to assure that the plaintiff (and others) were able to practice their faith. It shows that while MSDF could not have separate kosher kitchens, or a full-time on-site rabbi, it did make every effort to follow the Manual and the AND guidelines. It shows that MSDF staff worked to follow the policies, the Manual and the guidelines. It shows that on a few occasions a well-intended but ignorant staff member unwittingly violated the policy or guidelines, but that the defendants took immediate steps to correct the problem. It shows that on one occasion, there was a problem with the method in which the GFI casserole was served; again, staff took immediate steps to rectify the problem. Far from showing that the defendants intended to prevent the plaintiff from practicing Judaism and keeping kosher, the evidence is replete with examples that the defendants made consistent efforts to ensure that he could do so. The court will grant the defendants' motion for summary judgment, and will dismiss the case.

## II.    PLAINTIFF'S MOTIONS FOR SANCTIONS (Dkt. Nos. 138, 143)

On January 2, 2018, the plaintiff filed a motion for sanctions, claiming that certain of the defendants lied under oath. Dkt. No. 138. He later asked the court to "set aside" the first sanctions motion, and to accept a later motion making similar allegations. Dkt. No. 143. The court construes the second motion as a request to withdraw the first motion for sanctions, and will grant that request. Thus, the court turns to the merits of the second motion for sanctions. Dkt. No. 143.

The plaintiff asks the court to impose sanctions against defendants Heather Paulsen, Bruce Buege, Chris Loberg and Kelli Willard West for "fraud in making false statements under oath pursuant to 28 U.S.C. §1746." Dkt. No. 143 at 2. He first claims that Buege "provided contradictive information related to his level of involvement with his duty of supervision of the daily meals served." Dkt. No. 143 at 5. According to the plaintiff, Buege "is not being truthful, when questioned about how did he initially came [sic] into knowledge of the religious policy violation surrounding the plaintiff's religious meals." Id. He also states that Buege "continues these deplorable acts providing contradictive information about the identity of food service staff he allegedly instructed but could not name and false information to this court concerning action taken with said food service personnel." Id.

Specifically, the plaintiff alleges that Buege lied when he stated that he was not aware of the alleged violations to the kosher meal policy before an official inmate complaint was filed; the plaintiff says that he complained to

28

Buege about his kosher meals before then. Id. The defendants respond that the plaintiff had told Buege only that his meals were not kosher because they were not prepared in a kosher kitchen, and that he had not pointed to any actual violation before filing his inmate complaint. Dkt. No. 145 at 2. Next, the plaintiff claims that Buege lied with regard to the identity of the person who peeled the plaintiff's hard-boiled eggs. Dkt. No. 143 at 5-7. The defendants state that Buege's responses varied based on what he was being asked and what he remembered, but that he never lied. Dkt. No. 145 at 2. The plaintiff also asserts that Buege's response to an interrogatory that he does not "supervise the preparation and service of the kosher meal" is contrary to Buege's declaration, in which he states that he is responsible for the daily supervision of the preparation and service of all meals and special diets for MSDF inmates. Dkt. No. 143 at 4. The defendants respond that Buege, as Food Services Administrator, provides "the highest level of food service oversight at the prison," but that this does not mean that he is in the kitchen overseeing a particular meal being prepared. Dkt. No. 145 at 2. The plaintiff also alleges that Buege lied in response to the plaintiff's questions about serving a kosher meal from the menu of the general population. Dkt. No. 143 at 7-9. The defendants respond that if Buege's answers appeared to change, it is only because the plaintiff's interrogatory was written in a confusing and vague manner. Dkt. No. 145 at 2.

As to Loberg, the plaintiff states that she was "not truthful about her level of knowledge and involvement in failing to provide the plaintiff with the

religious meal." Dkt. No. 143 at 10. Specifically, the plaintiff takes issue with Loberg's declaration that "[u]ntil this current lawsuit, I do not recall ever being informed that there were violations in the kitchen with workers peeling hard-boiled eggs served to inmates who were on the kosher diet." Id. at 11. According to the defendants, the plaintiff has produced no evidence that he complained to Loberg specifically about eggs being peeled, and that if he did, she does not recall this. Dkt. No. 145 at 2.

Next, the plaintiff states that Paulsen lied in that she "took part in a fraudulent investigation and plagiarized the report of such investigation that falsely stipulated to MSDF's compliance with (DOC) religious policy." Dkt. No. 143 at 17-18. The defendants respond that the plaintiff has not provided evidence that Paulsen lied or abused the judicial process. Dkt. No. 145 at 3.

Finally, the plaintiff states that Willard West "acted in a deceptive manner by the creation of a fraudulent document to be used against the plaintiff as a means to dismiss the plaintiff's inmate complaint." Dkt. No. 143 at 20. The defendants respond that the plaintiff provides no evidence that defendant Willard West perjured herself or abused the judicial process. Dkt. No. 145 at 3.

The plaintiff asks the court to dismiss the defendants' motion for summary judgment and to impose monetary sanctions for the defendants' actions. Dkt. No. 143 at 26.

The plaintiff has made many allegations against these defendants, but has not provided evidence to support any of those allegations. It is not

uncommon for opposing parties to disagree with each other in a lawsuit, or to remember facts differently, or to interpret them differently. It is another matter for a party to accuse opposing parties of lying and committing fraud; a party making such allegations must be prepared to provide substantial proof to support such allegations. The plaintiff has presented no proof. The court will deny the second motion for sanctions.

III.  **CONCLUSION**

The court **GRANTS** the defendants' motion for summary judgment. Dkt. No. 102.

The court **GRANTS** the plaintiff's request to set aside his first motion for sanctions (dkt. no. 138) and deems the motion **WITHDRAWN**. Dkt. No. 143.

The court **DENIES** the plaintiff's second motion for sanctions. Dkt. No. 143.

The court **ORDERS** that this case is **DISMISSED**.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30** days of the entry of judgment. See Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Federal Rule of Appellate Procedure 4(a)(5)(A).

Under limited circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief

from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within 28 days of the entry of judgment. The court cannot extend this deadline. <u>See</u> Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. <u>See</u> Federal Rule of Civil Procedure 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated at Milwaukee, Wisconsin this 28th day of August, 2018.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**